**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **EVEXIA HOLDINGS, INC.** | **CIVIL ACTION NO.** |
| **Plaintiff,** | |
| **vs.** | **JULY 17, 2022** |
| **QUICK FUNDING GROUP, LLC** | |
| **Defendant** | |

**COMPLAINT**

Plaintiff, Evexia diagnostics, Inc. (Evexia or "Plaintiff"), by and through the undersigned

counsel, brings this lawsuit against Quick Funding Group ("QFG" or "Defendant") and alleges as

follows:

**NATURE OF THE ACTION**

1.      Plaintiff brings this action against QFG, a merchant Cash Advance ("MCA")

company seeking relief from QFG's unilateral seizure of its operating bank accounts without

notice or due process.

2.      Unfortunately, the type of conduct by Defendants here is a ballooning national

problem that has raised the attention of both state and federal regulators.

3.      In November 2018, Bloomberg News and renowned journalist Bethany McLean

(of Vanity Fair acclaim) published what would be the first in a series of groundbreaking news

articles exposing the abuses of the MCA industry, and its use of confessions of judgments to seize

out-of-state bank accounts.[1]

4.      The New York Legislature quickly took action, banning the use of out-of-state confessions of judgment in September 2019.  In support, the Legislature cited Bloomberg News.

5.      More recently, on February 10, 2022, Bloomberg News exposed a new tactic being abused by the predatory MCA industry, and in particular, Defendant here.  *See* **Ex. 1.**

6.      Specifically, Defendant operates out of New York but abuses an apparent loophole under Connecticut procedural law to collect upon their unlawful debts.  In doing so, Defendant freezes bank accounts by simply serving legal papers (which have not been reviewed or scrutinized by any court) on a bank that has a branch located in Connecticut.  As justification for their bank freezes, Defendants represent and attest under oath that their small business victims owe them a debt and that Defendants are unaware of any defenses to their claims.

7.      According to the 2022 Bloomberg News article, this Connecticut loophole was used more than 180 times just last year.  The result of this tactic is often catastrophic because Defendants can freeze bank accounts without any notice whatsoever.  Once frozen, Defendants can then extort payment under duress due to their victims' need to save payroll or pay other necessary business expenses, such as insurance, taxes, rent and inventory.

8.      This tactic is especially harsh because even when the small business victim capitulates to Defendant's extortionate demands, it is often too late because the release of those bank accounts may take days to unfreeze due to the processing delays and procedural constraints of individual banks and their levy departments.

---

[1] https://finance.yahoo.com/news/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html

9. In doing so, Defendant violated 42 U.S.C. § 1983 by violating Evexia's Fourteenth Amendment right to Due Process under the color of Connecticut state law. Among these intentional violations of due process, Defendant knowingly and purposely issued Prejudgment Writs of Attachment to third-party banks without first filing a complaint in state court, and without serving notice upon Plaintiff. Instead, Defendant required Plaintiff to execute form contracts of adhesion waiving their rights to a hearing. Thus, the first notice received by Plaintiff is when its bank accounts become frozen.

10. As set forth in the February 2022 Bloomberg article, just as New York has cleaned up its act and shut the door on predatory lenders abusing the COJ process, the same MCA industry has pulled up stakes and moved to Connecticut.

11. Connecticut is now at risk of becoming the new predatory lending capital of the United States. As set forth below, nowhere else can an MCA company decide unilaterally to freeze the assets of one of its victims (without filing any complaint or without any court oversight) and keep that victim squirming on the end of a hook without any due process until either the debtor breaks financially, or the MCA company decides it wants to file the complaint.

12. Evexia is just the latest victim of this corruption of the Connecticut Prejudgment Remedy Statutes and seeks the assistance of this Court in seeking relief from this violation of its constitutional rights.

## JURISDICTION AND VENUE

13. The jurisdiction of this Court is based on 28 U.S.C. §§ 1331 as Plaintiff brings this action under 42 U.S.C. § 1983.

3

14.     Specifically, the Plaintiff Evexia is a corporation organized under the laws of the state of Connecticut with a principal place of business in Connecticut and the Defendant QFG is a limited liability company organized in the state of New York and with a principal place of business in New York.  Upon information and belief, all members of the defendant LLC are citizens of the State of New York, and none are citizens of the state of Connecticut.

15.     Venue is proper in this court under 28 U.S.C. §§ 1391(b) and (c).

## THE PARTIES

16.     The Plaintiff Evexia is a corporation organized under the laws of the state of Connecticut with a principal place of business in Connecticut.

17.     The Defendant QGF is a limited liability company organized in the state of New York and with a principal place of business in New York, New York.  Upon information and belief, all members of the defendant are citizens of the State of New York, and none are citizens of the state of Connecticut.

## FACTUAL BACKGROUND

### The MCA Industry

18.     The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."  As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock." Just like in the

movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

19.    As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[2] The MCA Industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." Id.  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated." *Id.*

**The MCA Fiction**

20.    Many states have laws prohibiting the predatory interest rates. In order to evade these criminal usury laws, MCA companies disguise their agreements as "purchases of future receivables."  MCA companies promote a fiction that, rather than making loans to merchants, they are purchasing, at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts.  The form of the contract thus allows MCAs to represent to courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables. But the picture they paint is contrary to reality. By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the relationship and compel their merchants to make the fixed payments or suffer the consequences.

---

[2] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

**The 2018 Bloomberg Article Sparks Change**

21.　For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners. That all changed on November 20, 2018 when Bloomberg News and renowned journalist Bethany McLean published what would be the first in a series of groundbreaking news articles exposing the abuses of the predatory MCA industry.[3]

22.　As a direct result of the light shined on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of judgment, expressly citing the Bloomberg articles as its inspiration.

23.　Congress also took notice. On June 26, 2019, the United States House of Representatives held a hearing titled: "Crushed by Confessions of Judgment: the Small Business Story." As explained by Professor Hosea Harvey, a contracts expert from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.[6]

24.　Regulators have also taken action. On July 31, 2020, the New York Attorney General brought suit against a group of MCA companies, as well as their principals, alleging that their MCA agreements constitute criminally usurious loans.

25.　On July 31, 2020, the Securities and Exchange Commission shut down an MCA company. In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of which charged more than 400% interest, to small businesses across America." The FBI thereafter

---

[3] https://finance.yahoo.com/news/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html

raided its offices, confiscating a cache of guns, millions of dollars in cash, and a private airplane.

26.        On June 10, 2020, the Federal Trade Commission filed a complaint against John Braun and his various companies alleging various fraudulent and deceptive practices in connection with MCAs.

27.        On August 3, 2020, the Federal Trade Commission filed a complaint against Yellowstone. Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them."

28.        On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA company from doing business in California unless and until it complies with its laws.

29.        On December 8, 2020, the New Jersey Attorney General also filed suit against Yellowstone, alleging it cheated "financially-strapped small businesses and their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on future receivables with interest rates far exceeding the interest rate caps in the State's usury laws."

30.        On December 23, 2020, New York signed into law the Small Business Truth in Lending Law, which is aimed at "protecting small business owners," and "requires key financial terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."

31.        As Gretchen Morgensen of NBC News recently reported, however, the financial greed of predatory lenders, like Defendants, has only accelerated in the wake of Covid-19.

7

**The Shift in the Law**

32.    Prior to the Bloomberg article, courts routinely rejected attempts by small business victims seeking to vacate the many thousands of confessions of judgments filed by MCA companies.  Courts primarily denied those attempts on the procedural basis that a plenary action must be filed instead of merely seeking to vacate by motion.  One court went so far as to sanction the attorney for even bringing the motion.  *See, e.g., Yellowstone Capital LLC v. Central USA Wireless LLC*, 2018 N.Y. Misc. LEXIS 2516, *2 (N.Y. Sup. Ct., Erie Cty Jun. 25, 2018) (citing *Yellowstone Capital, LLC v. Jevin*, Index No. 802457/2017 (N.Y. Sup. Ct. Erie Co. Oct. 6, 2017)).

33.    The tide has since turned in the wake of the Bloomberg articles.  Most notable is the decision by Judge Nowak, a Commercial Division Justice out of Erie County—a favorite forum for MCAs given Upstate New York's more conservative political leanings. *See McNider Mar., LLC v Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct., Erie Cty Nov. 19, 2019). Notably, Judge Nowak reversed his own prior decision in Yellowstone Capital, LLC v. Jevin, supra, where he previously held that the very same Yellowstone agreement was not a loan as a matter of law. This time, upon further reflection, Judge Nowak not only upheld the claims of usury, but also upheld the RICO claims. Numerous courts have followed suit. See, e.g., Davis v. Richmond Capital Group, 194 A.D.3d 516 (1st Dept. 2021); NRO Boston LLC v. Yellowstone Capital LLC, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims); LG Funding LLC v. United Senior Properties of Olathe LLC, 122 N.Y.S.3d 309 (2d Dep't. 2020); American Resources Corp. v. C6 Capital, LLC, 2020 N.Y. Misc. LEXIS 10725, *6 (N.Y. Sup. Ct., Kings Cty. Dec. 16, 2020); Funding Metrics LLC v. NRO

Boston, 2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Westch. Cty. Aug. 28, 2019); Funding Metrics, LLC v. D & V Hospitality, 62 Misc.3d 966 (N.Y. Sup. Westch. Cty. Jan. 7, 2019), rev'd on other grounds.

34.     Numerous federal courts have also joined the revolution. *See Fleetwood Servs., LLC v. Ram Capital Funding LLC*, 2021 U.S. Dist. LEXIS 94381 (S.D.N.Y. 2021) (upholding RICO claims under MCA agreement); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*, 374 F.Supp.3d 361 (E.D. Pa. 2019) (same); *NRO Boston v. Funding Metrics*, 2018 U.S. Dist. LEXIS 239152 (E.D. Pa. May 23, 2018) (same).

35.     Most recently, several individuals and business owners have filed a class action lawsuit in the Southern District of New York seeking claims against several of the MCA companies that were cited in the February 2022 Bloomberg article (attached hereto as Exhibit 1) for exploiting the "Connecticut Loophole".  Just a few weeks ago, the Hon. Jed Rakoff, U.S.D.J. denied the Defendants' motion to dismiss a nearly identical 42 U.S.C § 1983 citing a nearly identical abuse of § 52-278(f). *Haymount Urgent Care PC v. GoFund Advance, LLC*, 22-cv-1245 (JSR) (S.D.N.Y. June 27, 2022).  In doing so the Court found that the class action plaintiffs had stated a cognizable claim that the MCA companies were using the Connecticut statute to deny the plaintiff's due process rights. *Id.*

**The MCA Agreements are Substantively and Procedurally Unconscionable**

36.     The MCA Agreements are unconscionable contracts of adhesion that are not negotiated at arms-length.

37.     Instead, the MCA Agreements contain one-sided terms that prey upon the

desperation of the small business and their individual owners and help conceal the fact that each of the transactions, including those involving the Plaintiffs, are really loans.

38.     Among these one-sided terms, the MCA Agreements include: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney to settle all obligations due to the MCA Company and (15) a power of attorney authorizing the MCA company to "file any claims or taken any action or institute any proceeding…"

39.     The MCA Agreements are also unconscionable because they contain numerous knowingly false statements. Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an

exorbitant ACH Program Fee or Origination Fee.

40.     The MCA Agreements are also unconscionable because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by preventing the merchant from obtaining other financing and requiring the merchant to continuously represent and warrant that there have been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

41.     The MCA Agreements also contain numerous improper penalties that violate Connecticut's strong public policy.  Among these improper penalties, the MCA Agreements (1) entitle the MCA company to attorneys' fees, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just one fixed daily payment.

42.     The Daily Payments under the MCA Agreement described below was fixed and absolute and the agreements' reconciliation provisions were a sham.

43.     Defendant did not maintain reconciliation departments and did not have any one trained or otherwise dedicated to performing any reconciliation of a merchant's accounts. Indeed, the MCA Agreements did not contain any functioning contact information whereby Plaintiffs could even request a reconciliation within the terms of that provision.

## Facts Specific to the Evexia MCA

44.     On or about May 5, 2022, Evexia entered into a "Merchant Agreement" (the "MCA Agreement") as well as a "Security Agreement and Guaranty" with QFG.

45.     The purported purchase price "paid" by QFG for these "future receivables" was set at $300,000.00.  The final purchase price amount to be repaid to QFG by Evexia was set at $435,000.00.

46.     At the same time, Dr. Kevin Bodling Bodling an owner of Evexia, was required to execute a Personal Guaranty.

47.     The MCA Agreement was actually a thinly disguised usurious loan with an effective annual interest rate of approximately 117%.

48.     Pursuant to the MCA Agreement, Evexia began making daily payments of $4,360 starting on or about May 5, 2022.

49.     On or about July 11, 2022, Crushed under the oppressive interest rates and $20,800 per week payments, Evexia sought some forbearance or latitude from QFG.

50.     After some brief negotiations, some four days later on July 15, 2022, and without any notice or recourse, Evexia's operating account at Webster Bank was frozen.

51.     Evexia was not served with a copy of any of the papers used to freeze the Webster account.

52.     Because no complaint or application was filed with any Court, there was no court docket to reference or matter on which to file.

**COUNT ONE**
**42 U.S.C. § 1983**

53.     Plaintiff hereby incorporates each of the above allegations as though fully set forth herein.

54.     In response to New York's prohibition against using its confession of judgment statute and related judgment collection procedures against out-of-state residents, Defendants knowingly and purposely devised a scheme to deprive out-of-state residents from their constitutional right to due process under the Fourteenth Amendment of the United States Constitution by abusing the state laws of Connecticut.

55.     Specifically, Defendant, who has a principal place of business in New York, devised a scheme where they would fraudulently register a series of related companies as Connecticut limited liability companies with a Connecticut address in order to avail themselves of Connecticut's prejudgment attachment statute.

56.     The relevant section of this statute, Conn. Gen. Stat. § 52-278(f), is unconstitutional as manipulated and used by Defendant.

57.     In its boilerplate contracts of adhesion, Defendant includes a form "Prejudgment Remedy Waiver," requiring merchants to waive "all rights to notice and prior court hearing or court order in connection with any and  all prejudgment remedies…"

58.     This "waiver", which cites to Connecticut Statute, is found at page 4 of 13 of the MCA Agreement hidden in a sea of small-point font.

59.     This "waiver" uses terminology that would not be familiar to a merchant, Connecticut or otherwise, and refers to a process that is all but unique to the Connecticut courts.

60.     This "waiver" was not knowing, intentional, or informed.

13

61.     When a merchant fails to pay the daily, usurious amounts prescribed pursuant to the MCA agreement, Defendants employ the prejudgment attachment mechanism of §52-278(f) by serving a Writ of Attachment on the merchant's bank account <u>before</u> the filing of a complaint and <u>before</u> serving the merchant.

62.     It should be noted that unlike the other "ex-parte" provisions of the Connecticut Prejudgment Statute, notably §52-278(e), subsection (f) seemingly requires no interaction with the court whatsoever before a plaintiff can execute against a defendant's bank accounts.

63.     In order to utilize its prejudgment attachment remedies, § 52-278(f) provides: "(1) *the complaint shall set forth a copy of the waiver*; (2) *the plaintiff shall file an affidavit* sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any known defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff; and (3) the *plaintiff shall include in the process served on the defendant a notice satisfying the requirements of subsections (b) and (c) of section 52-278e*."

64.     These requirements are also spelled out in the court's practice guide:

14

**II. PJR When Defendant In Commercial Transaction Has Waived Notice And Hearing (Section 52-278f of the Connecticut General Statutes) - Documents Required**

Note: These documents must be served on the Defendant. After service on the Defendant, these documents must be returned electronically to the Court in accordance with the E-Services Procedures and Technical Standards.

    A. A *Notice of Ex Parte Prejudgment Remedy/Claim for Hearing to Dissolve or Modify* (form JD-CV 55) may be used to meet the requirement of notice in Section 52-278f of the Connecticut General Statutes.

    B. Signed complaint that includes a copy of the waiver

    C. Affidavit by the plaintiff or another person who know the facts personally containing a statement of facts that show probable cause that a judgment in the amount of the prejudgment remedy being asked for, or in an amount greater than the amount of the prejudgment remedy being asked for after considering any known defenses, counterclaims or set-offs, will be rendered in the matter for the plaintiff.

65.    While Plaintiff pays lip-service to the letter of these requirements, it manipulates the language and the "serve first, file second" procedure of the Connecticut Superior Court to effect a hold-up of the debtor without due process or recourse.

66.    In the case of Evexia, QFG, true to its well-rehearsed *modus operandi*, drafted the Notice, Affidavit, and Complaint as required by the statute, but then delivered the documents to an accommodating state marshal who then served the papers on Webster Bank, timed so that Evexia discovered that its operating accounts were frozen on July 15, 2022, a Friday Afternoon.

67.    No notice or affidavit or complaint was served on Evexia.

68.    After Evexia's bank released the attorney contact for the entity that had effectuated the restraint on Evexia's account—QFG—counsel for Evexia contacted counsel for QFG on that same afternoon of July 15, 2022 and requested copies of the restraining papers.

69.    Counsel for QFG was unwilling to send Evexia's counsel the filing papers, but rather suggested the parties work something out to resolve the dispute.

15

70.     Due to the "serve first, file second" procedure of Connecticut Superior Court, QFG was able to freeze Evexia's bank accounts without filing anything with any court or notifying Evexia of its actions.  There is no court involvement until and if QFG decides to return the complaint to the superior court.

71.     Indeed, there is no docket number in Connecticut State court on which to file an objection or an injunction, or any judge assigned to rule on the legality of what QFQ has done.

72.     QFG is operating entirely outside the system, and Evexia is without remedy until such time as it decides to serve notice on Evexia and return the complaint to court.

73.     In the meantime, Evexia cannot pay its employees, cannot pay its vendors, cannot honor checks already issued, and cannot pay its taxes.

74.     In this way, QFG is abusing Conn. Gen. Stat. § 52-278(f) and the filing and service procedures of the Connecticut Superior Court under color of state law to knowingly and intentionally deprive Evexia of its constitutional due process rights and has no good-faith basis to believe their actions are lawful under the color of state law.

75.     Evexia, like many similarly situated merchants 1) was not represented by legal counsel in the MCA transaction; 2) had no experience with this Connecticut PJR "waiver" language; 3) did not have any prior pending actions against them by the Defendants; 4) did not have a fair balance of bargaining power; and 5) was knowingly and intentionally taken advantage of by Defendants due to their financial duress.

76.     The Defendant's knowing and intentional violation of 42 U.S.C. § 1983 was the direct and proximate cause of Evexia's damages, including among other things, not being able to

16

pay necessary expenses such as insurance premiums, vendor bills, payroll, taxes, and customer refunds.

**WHEREFORE**, while reserving the right to seek additional damages as available, Plaintiff prays for the following relief:

(a)     Declaring that the actions of Defendant, acting under the color of state law – specifically Conn. Gen. Stat. § 52-278(f) – deprived Plaintiff of its fundamental due process rights under the First and Fourteenth Amendments to the Constitution of the United States in violation of 42 U.S.C. § 1983;

(b)     Awarding Punitive Damages as Defendant's conduct was motivated by evil motive or intent or because the Defendant's conduct involved reckless or callous indifference to plaintiff's federally protected rights.

(c)     Awarding Compensatory Damages

(d)     Awarding Attorney's Fees under 42 U.S.C § 1988(b)

(e)     Any other equitable relief deemed appropriate by this Court.

Respectfully submitted,
*Evexia Holdings, Inc.*


By: __/s/ Nathan Zezula_____
      Nathan C. Zezula ct27936
      Mott Zezula LLC
      750 East Main Street
      6th Floor
      Stamford, CT 06902
      (203) 408-6500 (tel.)
      (203) 724-4179 (fax)

      *Its Counsel*